**JAY L. LICHTMAN**
State Bar No. 73399
LAW OFFICES OF JAY L. LICHTMAN
137 N. Larchmont Blvd., # 538
Los Angeles, California 90004
Telephone: (213) 568-0984
Facsimile: (213) 568-4761
Email: jaylawla@aol.com

Attorney for Defendant
**KIARA JAMIE-FLORES**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>KIARA JAMIE-FLORES,<br>Defendant. | No. CR 25-424-PA-2<br>**DEFENDANT'S SENTENCING MEMORANDUM; EXHIBITS**<br>Hearing Date: March 2, 2026<br>Hearing Time: 8:30 a.m. |

The defendant, KIARA JAMIE-FLORES (FLORES), through her undersigned counsel, JAY L. LICHTMAN, hereby files her Defendant's Sentencing Memorandum.

This filing is based on the attached arguments and exhibits, the complete file in this case, and any evidence or argument presented at a hearing on the matter.

Dated: February 9, 2026

Respectfully submitted,
/s/
JAY L. LICHTMAN
Attorney for Defendant
KIARA JAMIE-FLORES

Flores.Sent.Memo.2.26

# SENTENCING MEMORANDUM

## I.

## INTRODUCTION

The Probation Officer calculated a total offense level of 6, criminal history category I, resulting in a guideline range of 0 to 6 months for this misdemeanor conviction. Ms. Flores agrees with these calculations and urges the Court to impose a sentence of probation.

A probation sentence is supported not only by the guideline calculation but by other factors justifying downward departures and adjustments. First, the conviction essentially involved co-defendant Torres operating Ms. Flores' vehicle in a way which blocked Homeland Security officers' unmarked vehicles after they collected evidence pursuant to a warrant. At the time, Ms. Flores was a front-seat passenger and, as the government agrees, had no knowledge that the officers were on their way back to the office after collecting evidence. Indeed, a Supervisory Homeland Security Agent did not believe Ms. Flores would be charged with a crime for her role in this case. Moreover, this isolated incident in an otherwise law-abiding life would justify a downward departure for aberrant conduct. Similarly, courts have granted downward departures where the defendant's crime was an "isolated mistake" in the context of defendant's upstanding life. Finally, Ms. Flores' role in this case as a front-seat passenger compared to Mr. Torres who operated the vehicle should justify a mitigating role adjustment for Ms. Flores.

In addition, Ms. Flores is a single mother who is raising two teenage girls. Family and friends have written about how a prison sentence for Ms. Flores would have a devastating and long-lasting effect on the girls who depend on Ms. Flores for emotional guidance and financial support. Courts have granted downward departures for defendants experiencing such extraordinary family circumstances.

//

//

## II.

## MS. FLORES' HISTORY AND CHARACTERISTICS SUPPORT A PROBATIONARY SENTENCE

### A. Childhood and Adolescent Years

Kiara Jaime-Flores (Flores) is thirty-four years old. She was born in East Los Angeles and has resided in South Central Los Angeles all her life. Her parents were not married and separated when Ms. Flores was about age five at the time her mother was pregnant with her brother. After separation, Ms. Flores' father was not involved in her upbringing (PSR ¶¶ 51-53). Moreover, Ms. Flores was born with her right foot facing backwards requiring multiple surgeries and her strong memory of often being hospitalized as a young child (PSR ¶ 54).

Trouble started for Ms. Flores at about age eleven when she entered middle school at Los Angeles Academy. A group of girls resented Ms. Flores' first name "Kiara" which they claimed should not be used by a Latina girl. The girls started bullying Ms. Flores. Derogatory name calling became constant and demeaning. Ms. Flores' complaints made at the Dean's Office fell on deaf ears; school officials claimed they could do nothing to stop the harassment because there had not been a physical altercation. Predictably, less than a week later, at least six of the girls physically attacked Ms. Flores on her way to class, repeatedly punching her and calling her "snitch." School officials decided to transfer Ms. Flores to Carver Middle School for her "own safety." (See PSR ¶ 56).

Although the change of middle schools avoided the verbal and physical assaults on school grounds, Ms. Flores grew up in an unsafe neighborhood. Since certain people who lived in the neighborhood knew the girls who attacked her, they conducted their own type of harassment on Ms. Flores. Ms. Flores was fearful of being attacked when walking to the corner store or taking the bus to school. Consequently she had to be driven to school by her mother for her own safety.

From the second semester of seventh grade through eighth grade, Ms. Flores attended Carver Middle school. Carver had a cadet program which put the students through "boot camp", required the wearing of uniforms and conducted group counseling sessions. At this point in her life Ms. Flores was deeply depressed, angry at the world and cried often. Accordingly, her mother decided that the discipline offered by the cadet program at Carver was best for her daughter. Ms. Flores found the group counseling sessions with other cadets helpful. Ms. Flores was able to discuss her feelings about being harassed and targeted because of her ethnicity. Even after Ms. Flores attended Jefferson High School beginning in ninth grade, she attended the cadet after school program because of her need to work through her persistent emotional and mental problems (PSR ¶ 57).

But in tenth grade, Ms. Flores' life dramatically changed again. During Christmas break, at age fifteen, she met a boy and had sex for the first time. The following year she found out she was pregnant. Because her pregnancy was not physically visible, she was able to hide it from her parents for a while. When she finally asked her mother for help, Ms. Flores' pregnancy was too advanced to terminate if that had been her desire. Her mother expressed extreme disappointment in her daughter's irresponsible activities. Ms. Flores thought her life was over. Ms. Flores was transferred again to another school, namely Johnson Continuation School where other pregnant girls attended. In October 2007, at age sixteen, Ms. Flores gave birth to a baby girl. The child's father (and his family) abandoned Ms. Flores, offering no emotional or financial support. Ms. Flores continued attending Johnson but in the twelfth grade, the school was demolished and Ms. Flores was transferred to Hollywood High School. Since the distance from South Central to Hollywood was too far to travel each day, Ms. Flores was not able to finish high school (PSR ¶ 58).

At about age twenty, Ms. Flores was involved in another relationship. She again became pregnant and gave birth to her second daughter. Although the father expressed love for Ms. Flores, once the baby was born, he disappeared. Much like the boy (and

his family) who fathered her first child, the father of the second child abandoned her and left her alone without any financial or emotional support. Ms. Flores has tried her best to raise her daughters under difficult circumstances (PSR ¶ 59).

**B. Devastating Effects of Potential Prison Sentence on Ms. Flores and Her Two Teenage Daughters**

Ms. Flores' two teenage daughters, America and Genesis, are at the center of her world. The three are a close-knit family and her daughters depend on Ms. Flores for guidance, and emotional and financial support. A prison sentence for Ms. Flores would have a devastating effect on the teenage girls.

Gavina Lucia Herrera, a close friend of Ms. Flores, writes:

> As a mother, Kiara's world revolves around her daughters. I have watched Kiara prioritize her daughters' education and emotional well-being above all else. She isn't just a provider; she is the moral and emotional anchor for her children. She has worked hard as a single mother to provide them with a stable and loving environment, often putting their needs entirely above her own. If Kiara were to be sentenced to prison, I am deeply concerned about the impact it would have on her daughters, as she is their primary source of emotional and physical support. (Exh. A).

Yedid Ruvalcaba, Ms. Flores' stepsister, explains:

> Both of [Ms. Flores'] daughters have grown to be respectful, kind and very intelligent young ladies . .. If Kiara would have to be separated from her daughters, I know this would devastate both her as a person, and as a mother for the girls. They have never been away from each other. They are truly best friends, and I cannot imagine the pain this would cause them. Their emotional sanity would be wrecked . . . (Exh. B).

//

//

Luis Garcia, Ms. Flores' long-time friend, reflects:

> What has always stood out to me is Kiana's devotion to her daughters. Raising them as a single mother has been the central focus of her life . . . Her children are her motivation and everything she does is with their well-being in mind . . .
>
> Her children rely on her daily care, guidance and emotional support and her absence would be deeply felt. (Exh. C).

Gloria Real, a long-time friend and current preschool teacher, stresses:

> If Kiara were sentenced to prison, the impact on her daughters would be devastating. They rely on her completely for guidance, emotional stability and daily care. Removing her from their lives would cause significant and lasting harm to her family and disrupt the strong bond she has worked so hard to build with them. (Exh. D).

**C. Ms. Flores' Kindness and Deep Remorse for Her Actions**

Moreover, Ms. Flores carries the scars of her tumultuous upbringing. Nevertheless, she has shown remarkable resilience and kindness to others in need. For example, Ms. Herrera describes:

> Throughout the time I have known Kiara, I have seen her face significant challenges with a level of resilience that many do not possess. Growing up, Kiara dealt with hardships at home and the pressure of being a teen mother. Kiara grew up in an environment where many would have given up, yet she consistently showed a tenacious spirit and a desire to build a better life for herself.
>
> Despite these obstacles and influences of her environment, I have always known her to be a person with deep compassion and loyalty. Kiara also helps me with my doctor's appointments and transportation. (Exh. A).

Gloria Real describes:

> . . . [Kiara] has always been there for me and has helped me with my own children whenever I needed support. She is someone who can be relied on, and her actions consistently show kindness, responsibility, and care for others. (Exh. D).

Erica Machado, who has known Ms. Flores since they were teenagers, writes:

> . . . I have known Kiara to be a caring, responsible and kind individual.
>
> I have personally witnessed Kiara grow and mature over the years, and continue to see her striving each day to become a better person and a better mother. Her actions in this matter are completely out of character and do not reflect the person I have known for so long. Kiara has expressed deep remorse for her actions and truly regrets the situation she is in. (Exh. E).

Others have also witnessed Ms. Flores' deep remorse for her actions in this case. Ms. Herrera writes:

> Kiara has expressed profound remorse to me regarding her past conduct. She does not make excuses for her choices, but rather has focused on how she can change her path. Since these events took place, I have seen her try to overcome her past by consciously distancing herself from negative environments . . . (Exh. A).

Ms. Garcia expresses similar observations:

> Kiara has expressed deep remorse for her past actions, and I believe that remorse is genuine. She has spoken openly with me about the regret she carries and her desire to never place herself or her family in a similar situation again. I have seen her reflect on her mistakes and actively try to become a better person, not only for herself but for her daughters. (Exh. C).

Indeed, Ms. Flores' remorse was also demonstrated by her cooperation with the agents investigating the case before her arrest. Three months after the incident, Ms. Flores was visited by the agents. She admitted her involvement in the incident and consented to allow the officers free access to her phone. She also agreed to contact Mr. Torres and suggested that he cooperate with the agents. (PSR 18-21).

**III.**

**A DOWNWARD DEPARTURE IS JUSTIFIED**
**DUE TO MS. FLORES' ABERRANT BEHAVIOR**

If an offense represents aberrant behavior, a downward departure may be justified. USSG § 5K2.20. The departure is authorized for "a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." *Id.* § 5K2.20(b). See, e.g. *United States v. Booe,* 252 F.Supp. 2d 584 (F.D. Tenn 2003) (granting 9-level downward departure in bank robbery case to a young single mother with no criminal history); see also *United States v. Myers,* 355 F. Supp. 2d 1026, 1032 (S.D. Iowa 2005) (granting departure to time served for 42 year old defendant, with no prior record who was convicted of possession of a shortened shotgun, who had shortened the barrel's length for safety reasons).

In the instant case, Ms. Flores has no criminal record, has led a law-abiding life, and Mr. Torres' spur-of-the-moment action to drive the vehicle in a criminal manner was done without significant planning. Accordingly, Ms. Flores should be entitled to a departure for aberrant behavior.

**IV.**

**COURTS HAVE IMPOSED A DOWNWARD VARIANCE/DEPARTURE**
**DUE TO EXTRAORDINARY FAMILY CIRCUMSTANCES**

Although "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted" (USSG § 5H1.6), courts have

granted downward departures for extraordinary family circumstances. See e.g. *United States v. Aguirre,* 214 F.3d 1122 (9th Cir. 2000) (within district court's discretion to depart downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who has lost a father and would be losing a mother for a substantial period of time.); *United States v. Galante,* 111 F.3d 1029 (2nd Cir. 1997) (affirms district court's 13-level downward departure in a drug case from 46-57 months to 8 days where defendant showed he was a conscientious and caring father of two sons who would have faced severe financial hardship).

Ms. Flores is intimately involved with the emotional and financial care of her two teenage daughters. Ms. Flores' absence from the family unit would have a devastating and lasting impact on both Ms. Flores and the teenage girls. As Mr. Ruvalcaba describes:

> "They have never been away from each other . . . I cannot imagine the pain this would cause them. Their emotional sanity would be [w]recked. (Exh. B).

Accordingly, a probationary sentence would be warranted.

## V.

## FIRST TIME DEFFENDERS WHO ARE SENTENCED LENIENTLY PRESENT A LOW RISK OF RECIDIVISM

First-time offenders may receive downward departures based on a low risk of recidivism. See e.g. *United States v. Ross,* 557 F.3d 237 (5th Cir. 2009) (below-Guideline sentence was reasonable based on defendant's lack of criminal history, strong family support and a low likelihood of recidivism.) "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promotes successful reentry into society. Conversely when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valery Wright, *Deterrence in*

*Criminal Justice, The Sentencing Project,* at 7 (Nov. 2010). Indeed, studies reveal that low-risk offenders who are sentenced to long periods of incarceration are more likely to reoffend. *Id.* See also *United States v. Baker,* 445 F.3d 987 (7th Cir. 2006) (affirming downward variance, justified in part by court finding that prison would mean more to this defendant than one who has been in prison before.)

Moreover, a district court may vary downward where the offense appears to be an isolated mistake in an otherwise law-abiding life. See, e.g., United States v. Howe, 543 F.3d 128 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite 18-24 month Guideline range where district court termed offense an "isolated mistake" in the context of defendant's upstanding life); *United States v. Germosen,* 476 F. Supp. 2d 221 (D. Mass 2007) (sentence of 2 years probation with 6 months home confinement despite Guideline range of 37-46 months because defendant was a first-time offender "far down the organizational tree.")

Indeed, 28 U.S.C. § 994(j) directs the Sentencing Commission to ensure the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in case where the defendant is a first-time offender who has not been convicted of a crime of violence or an otherwise serious offense.

Ms. Flores has no prior criminal history. She has lived a law-abiding life before committing the criminal activity in this case which was an "isolated mistake".

## VI.

## THE COURT IS REQUESTED TO AFFORD MS. FLORES A DOWNWARD ADJUSTMENT FOR MITIGATING ROLE

### A. Legal Standards

A defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as 'minimal' may receive a "minor" role adjustment. USSG § 3B1.2(a), cmt. 5; *United States v. Dominguez-Caicedo,* 40 F.4th 960 (9th Cir. 2022). "To be eligible for either adjustment, the defendant must also be

'substantially less culpable than the average participant . . .'" *Id.* at cmt. 3(A); *Dominguez-Caicedo* at 960.

Commentary 3(C) to Section 3B1.2 sets forth the five factors that the district court should consider in deciding on the mitigating role adjustment. They include: (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity. Moreover, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.*

**B. Factual Analysis**

At the outset, perhaps reflecting the minimal role Ms. Flores had in the criminal activity, Ryan Ribner, a Supervisory Special Agent with Homeland Security "did not believe Flores would be a target to be indicted or arrested." Agent Ribner explained that "Flores was a subject because she was in the car but didn't think she would be charged." (Exh. F).

On the morning of February 28, 2025, Ms. Flores received a call from her aunt and a social media post that said "immigration" was on her street. As a result, Ms. Flores, as a front seat passenger, accompanied her boyfriend co-defendant Torres, the driver of Ms. Flores' vehicle, drove to a designated area. Ms. Flores recalls that there had been prior incidents in her neighborhood where criminals posing as ICE officers had abducted people. When Ms. Flores and Mr. Torres arrived at the location, they saw a small crowd which had gathered. They observed an unmarked vehicle pull out of the

driveway of a residence. Mr. Torres decided to follow the vehicle and temporarily block its path at the intersection. The vehicle was driven by Homeland Security officers. "Unknown to [Ms. Flores], the agents had collected evidence from the site and were transporting the evidence back to the . . . office." (Plea Agreement page 6, line 6; PSR ¶ 17). Mr. Torres followed the Homeland Security unmarked vehicles, now totaling three, onto the freeway where they sped away. (See PSR, ¶¶ 10-21).

### C. Mitigating Role

The Guidelines have been specifically amended "to address the reality that courts have applied § 3B1.2 'more sparingly than the Commission intended.'" United States v. Guia-Sendeme, 2025 U.S. App. LEXIS 9200, at *16-17, quoting USSG Supp. App. C, Amend 794, at 116-18 (2015), 2025 WL 1142356 (1st Cir. 2025). Compared to Mr. Torres, Ms. Flores played a mitigating role. Mr. Torres was the driver of the vehicle and was the one with decision-making authority. On the other hand, Ms. Flores, as a front-seat passenger, was more like an observer. Accordingly, Ms. Flores should be afforded a mitigating role adjustment.

## CONCLUSION

Section 3553(a) mandates that the Court impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in that statute. In applying that section, the Court should note that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 USC § 3582. In light of Ms. Flores' low guideline calculation, her history and characteristics and the devastating effect imprisonment would have on her teenage daughters, her first-time offender status and aberrant conduct, the Court is urged to sentence Ms. Flores to a sentence of probation.

Dated: February 9, 2026

Respectfully submitted,
/s/
JAY L. LICHTMAN
Attorney for Defendant
KIARA JAIME-FLORES

Flores.Sent.Memo.2.26